UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA PAULA P.,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>    Defendant. | Case No. 2:17-cv-09085-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

In July 2014, Ana Paula P. ("Plaintiff") filed an application for disability insurance benefits ("DIB") alleging disability commencing August 16, 2012, the date of an automobile accident. Administrative Record ("AR") 184-90, 3645-46.

On August 11, 2016, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified,

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

1

as did a vocational expert ("VE"). AR 42-89.

On September 12, 2016, the ALJ issued a decision denying Plaintiff's application. AR 21-41. The ALJ found that Plaintiff suffered from the medically determinable severe impairments of (1) migraine headaches; (2) cervical facet arthropathy; (3) degenerative disc disease of the lumbar spine; and (4) affective disorder/anxiety disorder. AR 26. Despite this impairment, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work. AR 28. Due to Plaintiff's mental impairments, the ALJ limited her to (1) performing simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work); (2) interacting with coworkers and the general public only occasionally; and (3) never operating a motor vehicle for work. Id.

Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff could not perform her past relevant work, but she could perform the work of a document preparer and addresser, Dictionary of Occupational Titles ("DOT") codes 249.587-018 and 209.587-010. AR 33. The ALJ concluded that Plaintiff was not disabled. AR 34.

## II.
## STANDARD OF REVIEW

A district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir.

2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

## III.
## ISSUES PRESENTED

Issue One: Whether the ALJ erred in giving little weight to the opinions of treating physicians Katayoun Omrani, D.D.S., Nadiv Y. Samimi, M.D., and Mike Uyeki, M.D.

Issue Two: Whether the ALJ asked the VE a complete hypothetical. (Dkt. 91, Joint Stipulation ["JS"] at 4-5.)

## IV.
## DISCUSSION

A. **ISSUE ONE: The ALJ's Evaluation of the Medical Evidence.**

**1. Rules for Weighing Conflicting Medical Evidence.**

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Turner v. Comm'r of SSA, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of

3

the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted); see also Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) ("If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." (citation omitted)).

Here, Dr. Omrani's opinion that Plaintiff could not focus for two hours at a time, could sit/stand for four hours but must get up every two hours for ten minutes, and was limited to lifting ten pounds, as well as Plaintiff's need to be absent more than three times per month, was contradicted by Dr. Nadella, Dr. Tashjian, and Dr. Nhac; Dr. Samimi's opinion that Plaintiff could sit for only one hour and stand/walk for two hours, needed hourly breaks, and would be absent more than three times per month was contradicted by Dr. Nhac; and Dr. Uyeki's opinion that Plaintiff could sit or stand/walk for four hours, needed to get up every two hours for a fifteen minute break, could lift or carry only ten pounds, and could never/rarely grasp, finely manipulate, or reach was contradicted by Dr. Nhac. Thus, the dispositive question is whether the ALJ gave "specific and legitimate reasons" for discounting the opinions of Plaintiff's treating doctors.

**2. Summary of the Medical Evidence.**

The AR contains treating records from three physicians: Drs. Omrani, Samimi, and Uyeki. Dr. Omrani primarily treated Plaintiff for migraine headaches. AR 2954-68, 3011-13, 3902-08. Dr. Omrani completed a detailed assessment/report of Plaintiff on January 12, 2015. AR 3011-13. In that report, Dr. Omrani wrote, "She is not able to exercise due to her ongoing pain" but rated her musculoskeletal and neurologic systems as "normal." AR 3012. Dr. Omrani concluded, "Based on her progress, it is very likely that her condition will exceed 12 months in duration. Physical activity cause more cervical pain for her and that

trigger more headaches for this patient [sic]." AR 3013.

On July 7, 2016, Dr. Omrani also completed a pain assessment questionnaire. AR 3902-08. Dr. Omrani opined that Plaintiff's pain had resulted in decreased activity, easy fatigability, and decreased sleep, but not difficulty driving or difficulty with activities of daily living. AR 3903. She recommended that Plaintiff avoid "extended computer use, vigorous physical activity, and sitting for [an] extended time." AR 3905. She opined that Plaintiff had cognitive limitations, including the inability to focus for two hours at a time. Id. Dr. Omrani wrote that during an eight-hour workday, Plaintiff could sit for four hours; stand or walk for four hours; every two hours Plaintiff must get up from a seated position and move around with a ten-minute break; and she could occasionally lift or carry 5-10 pounds. AR 3906. She found that Plaintiff had no significant limitations in reaching, handling, or fingering. AR 3907. She described Plaintiff's headaches as occurring 5 times a week and lasting over 4 hours, but she also found that Plaintiff would only experience pain symptoms severe enough to interfere with concentration for up to 2.66 hours/day. AR 3903, 3907. Dr. Omrani left blank the portion of the form asking for "signs and symptoms that support your diagnosis." AR 3904. Finally, Dr. Omrani opined that Plaintiff would be absent from work more than three times per month as a result of her impairments or treatment. AR 3908.

Dr. Samimi first treated Plaintiff on June 20, 2014. AR 2998. Dr. Samimi treated Plaintiff biweekly for pain complaints, including degenerative disc disease until December 8, 2014. Id. On December 17, 2014, Dr. Samimi completed a disability questionnaire. AR 2998-3002. Dr. Samimi opined that during an eight-hour day, Plaintiff could sit for only one hour and stand and/or walk for two hours. AR 3000. She would require getting up from a seated position every hour with "unknown" time before sitting again, and she would need hourly breaks of unknown duration. AR 3000-01. Dr. Samimi opined that Plaintiff could engage in

occasional reaching and frequent handling.  AR 3001.  Finally, Dr. Samimi opined that Plaintiff would be absent more than three times per month because of her impairments.  AR 3002.

Dr. Samimi also wrote a letter summarizing Plaintiff's condition dated December 21, 2014.  AR 3003.  Dr. Samimi wrote that Plaintiff suffered "severe and constant" pain since August 2013, such that she "is unable to perform the activities of daily living."  Id.

Dr. Uyeki was a treating physician for neck and back pain.  AR 2224-73, 2889-2953, 2992-97, 3609-38.  Dr. Uyeki first treated Plaintiff in 2009.  AR 2993. On December 10, 2014, Dr. Uyeki completed a disability impairment questionnaire. AR 2992-2997.  Dr. Uyeki opined that during an eight-hour workday, Plaintiff could sit for four hours; stand/walk for four hours; would need to get up from a seated position and move around every two hours with a 15 minute break; and could frequently lift or carry zero to ten pounds.  AR 2995-96.  Dr. Uyeki also opined that Plaintiff could "never/rarely" perform grasping, use hand/fingers for fine manipulations, and use arms for reaching.  AR 2996.  He opined that Plaintiff would only miss work once a month.  AR 2997.

The AR also contains progress notes from Plaintiff's treating psychiatrist, Dr. Long.  AR 3645.

In addition to these four treating doctors, the AR also contains opinions by consultative psychiatrist Rama L. Nadella, M.D. (AR 2883-87), and the state agency consultants.  Dr. Nadella opined that Plaintiff had some mild limitations on mental functioning but could maintain regular attendance and perform simple, repetitive tasks.  AR 2887.

State agency psychological consultant Dr. Tashjian found that Plaintiff had "moderate" functional impairments due to anxiety and affective disorder.  AR 95, 99.  She nevertheless could complete a 40-hour work week doing simple work with limited interpersonal contact.  AR 100.

State agency medical consultant Dr. Nhac found that Plaintiff could frequently lift up to 10 pounds, occasionally lift up to 20 pounds, and stand, walk, or sit for 6 hours in an 8-hour day. AR 97. Dr. Nhac assessed postural limitations but no manipulative limitations. AR 97-98.

### 3. The ALJ's Evaluation of the Medical Evidence.

The ALJ gave "little weight" to the opinions of Drs. Omrani, Samimi, and Uyeki. AR 32. As to all three, the ALJ found their opinions inconsistent with Plaintiff's reported activities. Id. The ALJ further found that Dr. Omrani, a pain specialist, was unqualified to opine on psychological issues and that Dr. Uyeki "did not provide support for the severe limitations he assessed to handling, fingering, and reaching." Id.

Concerning Plaintiff's mental impairments, the ALJ gave "significant weight" to Dr. Nadella's opinions as consistent with Plaintiff's activities. AR 31. The ALJ also gave significant weight to Dr. Tashjian's opinions as consistent with those of Dr. Nadella and reflecting "significant program experience." AR 32. The ALJ gave "little weight" to Dr. Long's opinions, a finding unchallenged on appeal. Id.

Concerning Plaintiff's physical impairments, the ALJ ultimately assessed an RFC with more exertional limits than opined by Dr. Nhac, comparable to the opinions of Dr. Uyeki but without Dr. Uyeki's manipulative limitations. Compare AR 28 and AR 97-98, 2995-97.

### 4. Summary of Evidence of Plaintiff's Activities.

The ALJ listed numerous activities that he considered inconsistent with the opinions of all Plaintiff's treating doctors. AR 31-32. Plaintiff argues that the ALJ considered these activities "out of context" and that they do not demonstrate that Plaintiff can work fulltime. (JS at 13.) The relevant question, however, is whether they are inconsistent with the opinions of Drs. Omrani, Samimi, and Uyeki.

The Court summarizes below the evidence concerning Plaintiff's activities

during the period of claimed disability, as listed by the ALJ:

- Going to the gym:

AR 3655 (12/3/12: Plaintiff enjoys going to the gym.)

AR 3662 (3/29/13: Plaintiff tells Dr. Long that she cannot go to the gym or bike ride with her husband because of "physical symptoms secondary to [August 2012 car accident].")

AR 1614 (4/17/13: Plaintiff tells physical therapist, "I have initiated pilates class with personal instructor at the gym. Additionally I will start with personal trainer next week.")

AR 3685-86 (6/27/14: Plaintiff tells Dr. Long that she is going to try pilates, because her pain doctor "wants her to lose weight, ride bike, and do [pilates]." She later decided against pilates "because so expensive.")

AR 3689 (8/14/14: Her doctors recommend physical therapy and "exercises 5 times a day for 10 minutes each" plus "10 min. walk and a few stretches.")

AR 3700 (2/10/15: "She has considered yoga and going to the gym.")

AR 3898 (2/15/16: Plaintiff tells emergency room staff that she "has been having more migraines after working out. She would like to cancel her gym membership.")

AR 3708 (2/27/16: She "was working out at gym daily for 2 weeks but had difficulty with anxiety and her back was hurting. It was mainly painful mentally. Both classes and ind exercises. In gym context a lot of anxiety ….")

- Taking care of her dogs:

AR 3655 (12/3/12: Plaintiff cannot bathe dogs because of back pain.)

AR 3657-58 (1/26/13: "In hollywood taking dogs to groomer …." She told her mother who was living with them that she did not need to clean up after the dogs, because "I will take care of the feeding, cleaning, bathing ….")

AR 3686 (7/23/14: "I try to take the dogs for 30 min walk and when home I have to put ice on back for 20 [min.] because of the pain.")

8

AR 272 (8/5/14: Plaintiff can "change [the dogs'] water and give them food. My mother walks them for me, since I can't go for long walks.")

AR 3688-89 (8/8/14: "Taking the dog to a training class." After "an hour drive and on feet a lot … I was in pain all weekend.")

- Driving:

AR 3645-46 (Plaintiff was in a car accident while driving on 8/16/12; Plaintiff drove to see Dr. Long on 9/4/12; her 9/5/12 interview discusses driving-related anxiety.)

AR 3648 (9/8/12: She drives slowly and hyper-vigilantly.)

AR 3650 (9/19/12: She drove to see Dr. Long on the freeway.)

AR 3652 (10/11/12: She "[s]till has anxiety driving.")

AR 3662 (3/18/13: Dr. Long "[e]ncourage[s] more driving.")

AR 3665 (5/8/13: Her "[d]riving anxiety is much less. But she doesn't drive very much.")

AR 3672 (9/28/13: She drove to see Dr. Long but prefers to drive only when necessary.)

AR 274 (8/5/14: Per her Function Report, she can drive alone.)

AR 3697 (12/1/14: She had a panic attack while driving when another motorist honked at her.)

AR 3703 (4/7/15: She drove one hour each way to an ultrasound class.)

AR 64-65 (March 2016: Plaintiff did not drive for 3 months after she ran a red light and "got really scared," but she drives "sometimes now" for "short trips." On days when she feels she cannot concentrate, she will ask her mother, husband, or Uber for a ride.)

- Cleaning the house:

AR 3658 (1/26/13: "Yesterday[ ]the house cleaner did not come so I cleaned the house. I was in a lot of pain and therefore[ ]did not sleep so well last night.")

AR 3684 (6/27/14: She did four loads of laundry carrying it up and down the

stairs, then "felt like some one had beate[n ]me on the back.")

AR 3685 (7/8/14: "I clean the house a little [and then] I am in a lot of pain.")

AR 273 (8/5/14: Per her Function Report, Plaintiff does no household chores.)

- Traveling and socializing:

AR 3667 (7/17/13: "I went to SD [San Diego] Sat and Sun and back on Monday with girl friends for bachelorette party but I did not enjoy myself as I used to.")

AR 3673 (1/13/14: Plaintiff struck her right foot on a chair "at party, while dancing.")[2]

AR 3684 (6/27/14: Plaintiff accompanied her husband on a business trip to Seattle. She "had nice time, drank modest the first 2 nights, 3[]rd night we went to all the bars on the street. Maybe I had too much because next am I did not[ ]know how I got home. BLACKOUT. … We walked a lot in Seattle. We would take a nap and go out again. We took some taxi[s] because of my back." After getting back, she "did nothing for four days.")

AR 3690-91 (8/29/14: She visited friend in Napa Tuesday-Friday and went wine tasting; she visited the same friend for her birthday in 2013. She flew alone but was sore after "running in airport with high heels.")

AR 3696 (11/10/14: "We are getting back to attending church.")

AR 3707 (8/31/15: On the weekend, she went to a bar to play pool but stopped after a short time due to pain.)

AR 3709 (5/30/16: "We went to Dominican Republic at hard rock hotel for vacation" from May 13 to May 21, 2016. "We went out with cousin one night.")

- Riding bikes with her husband:

---

[2] Plaintiff contends she struck her foot on the sidewalk while attending a house party. AR 65-66.

10

AR 3666 (5/8/13: "Yesterday bought bike so go for rides with husband.")

- <u>Working part-time</u>:

AR 3663 (4/8/13: Before the car accident, Plaintiff "was working 11-12 hours as nanny and planned wedding all herself.")

AR 3669 (7/25/13: "I need a job but can't do it because of pain. I am not lazy. I don't have the motivation to get a job which is unusual for me. I kind of want to take classes but then part of[ ]me doesn't want to.")

AR 3673, 3675 (1/13/14: She "[s]tarted working for NY Life as ins[urance] agent." She "[w]orks some at home and some at office." She held this job "since 11-2013," but will start fulltime next week, driving 20 minutes to the office.)

AR 3676 (2/5/14: She is selling life insurance and "working on training to get license for other products.")

AR 3677-78 (3/21/14: She took 6-8 weeks off work to heal after foot surgery but is "eager to get back to work." She "[h]as great difficulty feeling she is wasting time in terms of developing a CAREER. She is giv[i]ng up selling ins[urance] as that is not a good fit for her.")

AR 3699 (1/17/15: She interviewed for a customer service job with the Dollar Shave Club; she also considered work as a nanny driving older children, but she cannot lift younger children.)

AR 3700 (2/10/15: She interviewed for two nanny jobs, "but just sitting for interview for 45 minutes made her back hurt and she realized how hard it is to be nanny and that she doesn't want that kind of work.")

AR 47-48, 3712 (6/27/16: She "got part time job as product manager[;] it is internship to see if she can work…. Will work for up to 29 hours[;] Job near [LAX]." After three weeks, they let her go because she was not meeting expectations.)

- <u>Taking classes</u>:

AR 3651 (9/28/12: "[UCLA] classes in marketing.")

11

|   |   |
|---|---|
| 1 | AR 3665 (4/26/13: Plaintiff is uncertain when she will go back to work, but she is "considering law school.") |
| 2 | |
| 3 | AR 3702 (3/17/15: She "[w]ants to take marketing courses at [UCLA] extension … 7-10 pm once a week and will take 2-3 classes.") |
| 4 | |
| 5 | AR 3703-4 (3/30/15: She went to only 2 days of 21-day course to learn about being an ultrasound technician because of severe pain and because "[w]hen sitting in the class I felt I could not learn this amount of material." She also "shadowed an ultra sound gal last week ….") |
| 6 | |
| 7 | |
| 8 | |
| 9 | AR 3707 (1/16/16: "Took course at[ ]smc [Santa Monica College] on Microsoft office.") |
| 10 | |
| 11 | AR 4150 (3/18/16: "she continues to attend a continuing education class daily"). |
| 12 | |
| 13 | AR 3709 (5/30/16: "Took course in product management …. It was challenging because I was depressed … but I liked the material.") |
| 14 | |
| 15 | • Using a computer: |
| 16 | AR 3668 (7/17/13: "working [on the] ipad.") |
| 17 | AR 274 (8/5/14: She shops via computer.) |
| 18 | AR 3699 (2/3/15: "[A]fter 3 hours at computer her back is terribly painful.") |
| 19 | AR 3702 (3/17/15: "Wants to take marketing courses at UCLA extension … 7-10 pm once a week and will take 2-3 classes.") |
| 20 | |
| 21 | AR 3702 (3/17/15: She is "learning excel" and spent "2½ hours this am on computer.") |
| 22 | |
| 23 | AR 3704 (4/21/15: She is taking "computer course for 4 hours in bh [Beverly Hills] twice a week and pain is mild because she is focusing so much on the class." She is also learning coding language Python.) |
| 24 | |
| 25 | |
| 26 | **5. Analysis of Claimed Errors.** |
| 27 | As to all three of Plaintiff's treating physicians, the ALJ's finding of inconsistency between their opinions and Plaintiff's activities is supported by the |
| 28 | |

record.

a. Dr. Omrani.

The ALJ gave three reasons for discounting Dr. Omrani's opinions: (1) inconsistency with Plaintiff's daily activities, (2) lack of qualifications to opine on psychological issues, and (3) short-term treatment history with Plaintiff. AR 32.

<u>Reason One</u>: Dr. Omrani's opinion that Plaintiff has cognitive limitations, including the inability to focus for two hours at a time, is inconsistent with Plaintiff's taking college classes, using the computer for four hours at a time, and selling life insurance. Even Plaintiff stated, "I have no problem pay[ing] attention." AR 276. Dr. Omrani's opinion that Plaintiff was "not able to exercise due to her ongoing pain" is inconsistent with Plaintiff riding bikes with her husband, walking a lot in Seattle, and going to the gym. Thus, the ALJ's finding of inconsistency is supported by the record.

<u>Reason Two</u>: In a box labeled "associated psychological factors," Dr. Omrani opined that Plaintiff had "decreased concentration" and "inability to focus for two hours at a time." AR 3905. Dr. Omrani's lack of mental health specialization standing alone might not be a specific and legitimate reason to discount these opinions, but as discussed above, they are inconsistent with Plaintiff's reported activities and assessment of her unimpaired ability to pay attention.

<u>Reason Three</u>: Dr. Omrani first treated Plaintiff in August 2014. AR 3902. She had therefore treated Plaintiff approximately two months before completing the pain questionnaire. AR 3908. She wrote, however, that it was her opinion that Plaintiff's symptoms applied as far back as August 16, 2012, the date of the car accident. <u>Id.</u> The length of Dr. Omrani's treating relationship with Plaintiff is not a specific and legitimate reason to discount her opinions from 2014-2016, but it is a specific and legitimate reason to discount her opinions from 2012-2014.

b. Dr. Samimi.

The ALJ gave one reason for discounting Dr. Samimi's opinions:

inconsistency with Plaintiff's daily activities. AR 32. Dr. Samimi opined that during an eight-hour day, Plaintiff could sit for only one hour and stand and/or walk for two hours. AR 3000. In other words, Dr. Samimi opined that Plaintiff needed to spend all but three hours each work-day lying down. This is inconsistent with Plaintiff's reports of being able travel to Napa, the Dominican Republic, and Seattle, as well as her ability to take classes, do some exercise, and do part-time work. Even Plaintiff thought that she could probably physically complete an eight-hour work day if she could sit for "three hours between taking breaks, moving around, lying down." AR 59.

### c. Dr. Uyeki.

The ALJ gave two reasons for discounting Dr. Uyeki's opinions: (1) inconsistency with Plaintiff's daily activities, and (2) lack of support for his extreme limitations on Plaintiff's handling and fingering. AR 32.

As summarized above, during the period of claimed disability, Plaintiff has often engaged in activities that require grasping and fingering, such as driving and typing on a computer to take classes or shop. She did not report any difficulty using her hands in the function report. AR 276.

### d. Development of the Record.

Plaintiff argues that once the ALJ rejected the opinions of her three physicians, the ALJ had no medical evidence in the record on which to base his RFC findings, so he impermissibly "placed himself in the shoes of a medical professional and played doctor." (JS at 16.) Plaintiff argues that the ALJ should have further developed that record by ordering a consultative examination. (Id.)

In fact, Plaintiff's emergency room and surgical records provided other medical evidence, as did the state agency physicians and Dr. Long. Plaintiff has not demonstrated that the ALJ erred by failing to further develop the record.

B. **ISSUE TWO: The Hypothetical Posed to the VE.**

    **1. Summary of Relevant Administrative Proceedings.**

The ALJ asked the VE to consider what work a hypothetical person with certain limitations could perform. AR 74. The ALJ then told the VE to consider the same set of limitations along with a few additional ones. AR 75. As a third hypothetical, the ALJ asked the VE the following:

> And carrying forward, the same set of limitations as I just gave you in hypothetical 2, but now overhead reaching bilaterally is occasional and all handling and fingering is frequent bilaterally *and no operating a motor vehicle*.

AR 76 (emphasis added).

The ALJ then posed a fourth hypothetical: "Now, how about on that same hypothetical if I dropped the exertional to the same set of limits, but now the exertion limit is sedentary?" Id. In response to the fourth hypothetical, the VE testified that the hypothetical worker could perform the jobs of document preparer and addresser. Id.

The ALJ ultimately adopted an RFC that restricted Plaintiff from ever operating a motor vehicle for work. AR 28.

    **2. Analysis of Claimed Error.**

Plaintiff contends that the ALJ posed an incomplete hypothetical because the ALJ "never posed the 'must never operate a motor vehicle for *work*' limitation into his hypothetical question to the vocational expert." (JS at 23.) By italicizing "for work" for emphasis, Plaintiff seems to be arguing that the restriction "no operating a motor vehicle" was incomplete because it did not say "for work."

A restriction against operating a motor vehicle logically includes a restriction against operating a motor vehicle for work, for leisure, or for any other purpose. Plaintiff has failed to carry her burden of demonstrating legal error.

# V.
# CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: October 19, 2018

_/s/ Karen E. Scott_
KAREN E. SCOTT
United States Magistrate Judge